# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 18 2020, 10:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT R.C. (FATHER)

Zachary J. Stock
Carmel, Indiana

ATTORNEY FOR APPELLANT K.R. (MOTHER)

Lisa D. Manning
Danville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter the of the Termination of the Parent-Child Relationship of B.C., K.C., and M.C. (Minor Children) and R.C. (Father) and K.R. (Mother);

R.C. (Father) and K.R. (Mother),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

September 18, 2020

Court of Appeals Case No. 20A-JT-568

Appeal from the Vigo Circuit Court

The Honorable Sarah Mullican, Judge

Trial Court Cause No.
84C01-1907-JT-863
84C01-1907-JT-864
84C01-1907-JT-865

**May, Judge.**

[1]     R.C. ("Father") and K.R. ("Mother") (collectively, "Parents") appeal the termination of their parental rights to B.C., K.C., and M.C. (collectively, "Children"). Parents argue the trial court's findings do not support its conclusions that the conditions under which Children were removed from Parents' care would not be remedied, that the continuation of the Parent-Children relationship poses a threat to Children's well-being, and that termination was in Children's best interests. We affirm.

# Facts and Procedural History

[2]     Mother and Father are the biological parents of B.C., born July 27, 2010; K.C., born June 22, 2015; and M.C., born January 31, 2017. On January 31, 2017, the Department of Child Services ("DCS") received a report that Mother had tested positive for opiates and marijuana at the time of M.C.'s birth. Mother admitted to the Family Case Manager ("FCM") investigating the report that she had taken Vicodin without a prescription and smoked marijuana while pregnant. The FCM recommended the family engage in an informal adjustment program to address Mother's substance abuse issues. Father also admitted smoking marijuana and drinking alcohol. He indicated he would stop smoking marijuana, but refused to stop drinking alcohol because he "didn't

understand why DCS was recommending any treatment at all." (Tr. Vol. II at 36.)

[3] Shortly thereafter, Parents moved into a hotel room and later moved to maternal grandmother's house. Father continued to refuse to comply with the terms of the informal adjustment, and Mother tested positive for methamphetamine and THC. The FCM visited maternal grandmother's home and found maternal grandmother asleep on an air mattress in the living room with newborn M.C. face down on her chest. The FCM asked maternal grandmother to take a drug test, and maternal grandmother refused. DCS recommended additional services to "preserve placement in the home" because of the "continued concerns of [Mother's] substance abuse, her being in denial of using methamphetamine, um, inappropriate care givers, overall lack of compliance and [sic] services and treatment [and] [Father's] refusal to stop drinking or using marijuana[.]" (*Id.* at 37.)

[4] On February 17, 2017, DCS filed petitions alleging Children were Children in Need of Services ("CHINS") based upon Parents' inability to provide Children with a drug free home and Mother's positive drug tests. Children continued in placement with Parents. On March 14, 2017, the trial court held an initial hearing on the CHINS petition as to B.C.,[1] during which Mother admitted to

---

[1] The initial CHINS proceedings involving B.C. were separate from those involving K.C. and M.C. because, while Father was listed as B.C.'s legal father, another man, R.B., was alleged to possibly be B.C.'s father. Father later established paternity in the CHINS matter.

using drugs in the home. On April 11, 2017, the trial court held an initial hearing on B.C.'s CHINS petition as to Father, during which Father appeared telephonically and admitted B.C. was a CHINS. Based on Parents' admissions, B.C. was adjudicated a CHINS on May 11, 2017.

[5] On April 11, 2017, the trial court also held an initial hearing as to the CHINS petition for K.C. and M.C., which was continued to April 21, 2017, because Parents were not present. On April 19, 2017, DCS removed Children from Parents' care based on Parents' continued drug use. Children were placed in relative care.

[6] On April 21, 2017, the trial court held a continued initial hearing as to K.C. and M.C. during which it noted Mother's admission of drug use in the home during the initial hearing as to B.C. Father denied the allegations of the CHINS petition, and thus the trial court set the matter for a fact-finding hearing. On May 9, 2017, the trial court held a fact-finding hearing as to K.C. and M.C. and adjudicated K.C. and M.C. as CHINS by its order on May 11, 2017. On May 9, 2017, the trial court also held a dispositional hearing as to B.C. and issued its dispositional decree as to B.C. on June 12, 2017. The trial court held its dispositional hearing as to K.C. and M.C. on June 6, 2017, and entered its dispositional decree as to K.C. and M.C. on July 6, 2017.

[7] Both dispositional decrees ordered Parents to refrain from the use of drugs and alcohol; submit to random drug screens; complete parenting assessments and all recommended services; complete substance abuse assessments and all

recommended treatment; participate in home based case management services; and complete psychological exams and all recommended treatment. The trial court also ordered Father to participate in fatherhood engagement services. At the beginning of the CHINS case, Parents consistently participated in services. Parents both attended and completed a fourteen-week drug rehabilitation program. Father earned his GED and became a journeyman carpenter with the local union.

[8] Based on Parents' progress in services, DCS recommended and the trial court approved a trial home visit on August 25, 2018. The family was living with Paternal Grandfather. In November 2018, Mother moved in with Maternal Grandmother and shortly thereafter tested positive for methamphetamine, amphetamine, and THC. Father tested positive for THC on November 28, 2018. DCS put a safety plan in place allowing Father to go to Maternal Grandmother's house when Children were present to be the sober caregiver there and offered Mother additional services to help address her substance abuse issues.

[9] On January 28, 2019, DCS filed a motion to extend the trial home visit another three months so the family could receive more services and work toward reunification. Parents continued to test positive for THC. In February 2019, DCS referred Parents to homebased case management through the Hamilton Center with goals of establishing a budget, finding housing, and completing substance abuse treatment. Father attended one of the thirty-two sessions and Mother attended sixteen of the thirty-two sessions. Father claimed he did not

attend sessions because he was working. During a home visit by the Hamilton Center counselor, Mother admitted she had not been going to the methadone clinic as directed in her substance abuse treatment and sometimes she "was not able to eat because she was high." (*Id*. at 127.) Parents' services through Hamilton Center were closed due to noncompliance in May 2019.

[10] On February 25, 2019, Children were placed solely with Father under the condition that Father would remain in Paternal Grandfather's home with Children and would supervise visits with Mother. Two days later, Father tested positive for methamphetamine. When the FCM visited Paternal Grandfather's home to report the drug screen, Paternal Grandfather assured the FCM that there would be a "sober care giver in place [and there would not be] any instances of domestic violence." (*Id*. at 94.) On March 4, 2019, Father informed the FCM that Paternal Grandfather "had become physical" with Father in front of Children so Father took Children to "his grandmother's home." (*Id*.) The next day, DCS ended the trial home visit and placed Children with Maternal Aunt, where they have remained for the pendency of the proceedings.

[11] After Children were placed with Maternal Aunt, she supervised visits between Parents and Children. Maternal Aunt "got uncomfortable supervising" visits and asked DCS to appoint a visitation supervisor. In June 2019, Parents were involved in a domestic violence incident that resulted in a no-contact order between Mother and Father. After that time, because DCS was concerned about Parents visiting together, Parents' visits with Children were separated,

even after the no-contact order was "dropped." (*Id*. at 103.) Overall, Mother attended approximately seventy percent of the scheduled supervised visits and Father attended approximately fifty percent of the scheduled supervised visits.

[12] Parents also continued testing positive for illegal drugs. Mother tested positive for amphetamine, methamphetamine, and THC nine times between March and September 2019. Father tested positive for amphetamine, methamphetamine, and THC four times in the same time period. He also tested positive for THC an additional four times in that time period and amphetamine and methamphetamine one additional time.

[13] On July 18, 2019, DCS filed petitions to terminate Parents' parental rights to Children based on their substance abuse and noncompliance with services. On August 5, 2019, the trial court ordered Parents to enter inpatient substance abuse treatment immediately. Parents were both accepted into separate inpatient rehabilitation programs, but neither completed those programs.

[14] The trial court held fact-finding hearings on DCS's termination petitions on September 30, 2019, November 25, 2019, and January 13, 2020. During this seven-month period, Mother was convicted of theft and fraud and was incarcerated. At the time of the January 2020 fact-finding hearing, Mother resided in a community corrections work release program and was scheduled to start orientation for a job at Wendy's. During the same time period, the State charged Father with check deception, fraud, counterfeiting, and theft, and all those charges were pending at the time of the January 2020 fact-finding hearing.

The trial court entered its order terminating Parents' parental rights to Children on February 7, 2020. Mother filed a motion to correct error on February 24, 2020, and it was deemed denied forty-five days later under Indiana Trial Rule 53.5(a).

# Discussion and Decision

[15] We review termination of parental rights with great deference. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent's rights only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

[16] "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A trial court must subordinate the interests of the parents to those of the children when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837. The right to raise one's own children should not be terminated solely because there is a better home available for the children, *id*., but parental rights may be terminated when a parent is unable or unwilling to meet parental responsibilities. *Id*. at 836.

To terminate a parent-child relationship, the State must allege and prove:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8.

When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine whether the evidence supports the findings and whether the findings support the judgment.

*Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208. Parents challenge the trial court's conclusions that there was a reasonable probability that the conditions under which Children were removed from Parents' care would not be remedied, that the continuation of the Parent-Children relationship posed a threat to Children's well-being,[2] and that termination was in Children's best interests. As Parents do not challenge the findings made by the trial court, we accept them as true. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) ("Because Madlem does not challenge the findings of the trial court, they must be accepted as correct.").

## 1. Conditions Would Not Be Remedied

[19]     A trial court must judge a parent's fitness to care for her child at the time of the termination hearing. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). Evidence of a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services "demonstrates the

---

[2] Parents also allege the trial court's findings do not support its conclusion that the continuation of the Parent-Children relationships posed a threat to Children's well-being. Because we hold the trial court's findings supported its conclusion that the conditions under which Children were removed from Parents' care would not be remedied, we need not consider Parents' argument regarding whether the continuation of the Parent-Children relationships posed a risk to Children's well-being. *See In re L.S.*, 717 N.E.2d at 209 (because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the court need find only one requirement to terminate parental rights).

requisite reasonable probability" that conditions will not change. *Lang v. Starke Cty. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. Regarding this element, the trial court found:[3]

> 1. DCS received a report on January 31, 2017, that Mother, [K.R.], had delivered her second[4] child while testing positive for unprescribed opiates and THC. She had tested positive for Benzodiazapines and THC at her first prenatal appointment in July 2016.

> 2. On March 8, 2017, [Parents] both signed a safety plan which included participation in Homebuilders, completing random drug screens, and completing a drug and alcohol assessment.

> 3. On March 30, 2017, a new therapist and case manager were assigned to the case, but by April 21, 2017, [Parents] had had no contact with the case manager since the initial contact and Mother had failed to participate in the drug and alcohol assessment. Both [Parents] began missing screens and testing positive for drugs and/or alcohol, including methamphetamine, THC and opiates.

> 4. [Parents] moved out of the hotel they had been living in and moved into new housing. The child's grandmother was sleeping on an air mattress on the floor with the newborn infant on her chest, sleeping face down. Grandmother refused to submit to a drug screen and was therefore not approved to be a caregiver.

---

[3] The trial court's orders terminating Parents' parental rights to Children are virtually identical, except for the portion of B.C.'s order regarding R.B. We recite the findings from B.C.'s order.

[4] M.C. is actually Mother's third child.

5. At this time [R.B.] was alleged to be [B.C.'s] father, and he refused to participate in services, claiming that he was working seven days a week.

6. At the time of the fact-finding hearing on the termination petition, the evidence indicated that Mother had not been employed since 2015 and had no driver's license or stable housing. After testing positive for meth, Mother refused to submit to drug screens.

7. While in services in the CHINS case, Mother participated in drug treatment, participating in the Matrix program and then going to a rehab facility which she left before finishing the program. Father also left a rehab facility prematurely and continues to struggle with drugs. A trial home visit was ended when Mother tested positive for meth again.

8. In 2019, [Father], who established paternity of [B.C.], got into a fight with his own father and was arrested. He testified that he had struggled with addiction for thirteen (13) years and uses "anything to make me not think, not feel."

9. Based upon [Parents'] completion of services, [Children] went on a trial home visit with Mother from August 25, 2018 to approximately mid-February 2019, when she repeatedly tested positive for drugs, including meth.

10. In July 2019, DCS filed a petition for termination of parental rights and a motion to stop services for [Parents]. The court held a hearing and denied [sic] to stop services, instead ordering [Parents] to complete an in-patient substance abuse program. Both [Parents] entered rehab facilities. Father checked himself out after twelve (12) hours and Mother left her facility on an 8-hour pass and didn't return and was then arrested in a motel room.

11. During the pendency of these CHINS proceedings, Mother has been arrested multiple times, including the following:

a. In the fall of 2017 [Mother] was charged with stealing her grandmother's purse and using a credit card without authorization (Cause No. 84D01-1712-F6-3992);

b. In April 2018, [Mother] was charged with fraud on a financial institution and check fraud (Cause No. 84D01-1804-F4-1117);

c. In August 2019, [Mother] was charged with three counts of credit card fraud (84D01-1909-F6-3784);

d. In September 2019, [Mother] was accused of residential burglary and theft (84D01-1910-F4-4141).

12. Several of these charges remain pending and are set for trial this year.

13. Based upon evidence presented and the court's judicial notice of his criminal record in Vigo County, the court finds that [Father] has the following arrests and convictions:

a. He was charged with Dealing Methamphetamine and Possession of Methamphetamine in Cause No. 84D03-1308-FB-2381 and entered a plea to the possession charge;

b. He was charged with Domestic Battery in the presence of a child under 16 involving [Mother] in Cause No. 84D03-1203-FD-746. He pled guilty to domestic battery;

c. Pled guilty to theft as a Class D felony in Cause No. 84D03-1101-FD-305.

d. Was charged with strangulation, domestic battery and domestic battery with a previous conviction in Cause No. 84D01-1906-F5-2217. He entered a guilty plea to domestic battery against [Mother] as a Class A misdemeanor.

e. He was charged with counterfeiting, check deception, theft, and theft with a prior conviction under Cause No. 84D03-1909-F6-3633, and this cause remains pending;

f. He was charged with identity deception and fraud in Cause No. 84D03-1911-F6-4553, and this cause remains pending;

g. He was charged with counterfeiting and theft in Cause No. 84D03-1912-F6-4663, and this cause remains pending;

h. The last three (3) arrests for felony charges have occurred after the proceedings for termination have [sic] begun.

14. In recent months, [Mother] has been very inconsistent with calling to drug screen, and [Father] was failing to contact the FCM altogether for several weeks this past fall. On November 19, 2019, in the middle of the termination proceedings, Father tested positive for methamphetamine, amphetamine and THC.

15. In June 2019, there was a domestic violence incident involving [Parents], so DCS started separating their visits.

16.  In the second half of 2019, Mother attended approximately 70% of the supervised visits that were offered to her and Father attended approximately 50% of them.

17.  The CASA testified that, although [Parents] have made efforts at reunification, they cannot stop using drugs and the CHINS cases have been pending for three (3) years.

(App. Vol. II at 101-4.)

[20]     Parents argue the trial court's findings do not take into account their progress presented at the final fact-finding hearing.  Specifically, Mother contends that, as of that hearing, she

> had improved her conditions that led to removal of [Children]. Mother testified that she began therapy, has secured employment at Wendy's, and had secured a diagnosis and was being medically treated for ADHD, split personality disorder, and PTSD.  Mother also voluntarily ended her addiction to methadone.  At the time of the January 13, 2020, hearing, mother was sober from all controlled substances.  Mother's most recent two drug screens both returned negative for controlled substances.

(Br. of Appellant Mother at 14) (citations to the record omitted).  Similarly, Father maintains

> Father started screening negative for drug use on December 23, 2019.  Father started probation in January 2020 and his weekly drug tests were always negative.  Father was again living with his father and the men had repaired their relationship in large part due to the elder man's completion of anger management therapy. Father reengaged in services through the Matrix program.  He

> regularly attends church, AA and NA, all of which have been helping him.

(Br. of Appellant Father at 9) (citations to the record omitted).

"[I]t is within the province of the trial court, as the finder of fact, to ignore or discredit" evidence of Parents' actions shortly before the termination hearing. *Matter of C.M.*, 675 N.E.2d 1134, 1140 (Ind. Ct. App. 1997). While it is commendable that Parents are making strides toward recovery from substance abuse and stability in employment, we cannot ignore their patterns of substance abuse, insufficient housing, and criminal activity over the last three years during the CHINS and termination proceedings. Parents' arguments highlighting their recent actions are invitations for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh evidence or judge the credibility of witnesses). Thus, the trial court's findings supported its conclusion that the conditions under which Children were removed from Parents' care would not be remedied. *See K.T.K. v. Indiana Dept. of Child Services, Dearborn Cty. Ofc.,* 989 N.E.2d 1225, 1289 (Ind. 2013) (trial court's findings supported its conclusion that the conditions under which child was removed from mother's care would not be remedied based on mother's patterns of behavior throughout the proceedings despite mother's progress made shortly before termination).

## 3. Children's Best Interests

[22]  In determining what is in Children's best interests, a trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. dismissed*. A parent's historical inability to provide a suitable environment, along with the parent's current inability to do so, supports finding termination of parental rights is in the best interests of the child. *In re A.L.H.*, 774 N.E.2d 896, 990 (Ind. Ct. App. 2002). The recommendations of a DCS case manager and court-appointed advocate to terminate parental rights, in addition to evidence that conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in Children's best interests. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[23]  Father argues the termination of their parental rights to Children is not in Children's best interests because "[Children] told CASA they wished to return home to Mother and Father's home. Other than a need for a permanent place, DCS failed to present evidence that the [Children's] best interests are served by terminating Father's parental rights." (Br. of Appellant Father at 16) (citations to the record omitted). Similarly, Mother contends visitation with Children was "going well[,]" Children wished to return home with Parents, and "DCS

testified at haring [sic] that B.C. would be emotionally upset if Mother's rights were terminated." (Br. of Appellant Mother at 16.)[5]

[24] In addition to the trial court's findings to support its conclusion that the conditions under which Children were removed from Parents' care would not be remedied, the CASA in the case testified she believed termination of Parents' parental rights would be in Children's best interests because Children have "been through a lot of heartache" and "would be better off to have a permanent place." (Tr. Vol. II at 81.) She stated she did not believe Parents were "bad people" but that "drugs have become more important than being parents for their children." (*Id.*)

[25] Regarding B.C.'s feelings about the termination of his Parents' parental rights, the CASA testified she felt the letter B.C. wrote to the court to that effect may have been "coerced" because Mother gave CASA the note at the end of a visit and said B.C. wrote the note "two (2) or three (3) days prior" despite the fact that the CASA saw him writing it during the visit. (*Id.* at 88.) Parents' arguments are invitations for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh evidence or judge the credibility of witnesses). Based thereon, we conclude the trial court's findings support its conclusion that the termination of Parents' parental rights was in Children's best interests. *See*

---

[5] The trial court admitted a letter from B.C. indicating this. The court acknowledged the letter in the transcript, but a copy of it does not appear in the record before us.

*In re J.S.*, 906 N.E.2d at 236 (recommendation of termination by DCS case worker and CASA coupled with conclusion that parent would not remedy the conditions under which child was removed was sufficient to terminate parent's rights to child).

# Conclusion

[26] The trial court's findings supported its conclusions that the conditions under which Children were removed from Parents' care would not be remedied and that termination of Parents' parental rights was in Children's best interests. Accordingly, we affirm the judgment of the trial court.

[27] Affirmed.

Riley, J., and Altice, J., concur.